2000 OK CR 6

Charles F. TAYLOR, Appellant,

v.

STATE of Oklahoma, Appellee.

No. F-96-1102.

Court of Criminal Appeals of Oklahoma.

Feb. 25, 2000.

---

John Thomas Elliott, Indigent Defense System, Norman, Jim B. Miller, McAlester, for Defendant at trial.

Donnita Wynn, District Attorney, Christopher Wilson, Assistant District Attorney, McAlester, for the State at trial.

James A. Drummond, Sandra Mulhair Cinnamon, William H. Luker, Appellate Defense Counsel, Norman, for Appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Robert Whittaker, Asst. Attorney General, Oklahoma City, for Appellee on appeal.

## OPINION

JOHNSON, Judge:

¶1 Charles F. Taylor, Appellant, was charged in Pittsburg County District Court, Case No. CRF–95–570, with Murder (malice aforethought) in the First Degree (Count I), and three counts of Shooting with Intent to Kill (Counts II, III, and IV). The jury found Appellant guilty on all counts and recommended life imprisonment on Counts II, III and IV and the death penalty on Count I after finding two aggravating circumstances: Appellant knowingly created a great risk of death to more than one person; and the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution. Judgments and Sentences were imposed in accordance with the jury's verdicts. Appellant has perfected his appeal to this Court.

### FACTS

¶2 In mid-October, 1995, three weeks prior to the commission of the crime, Appellant and Shelia Pelz, Appellant's girlfriend, brought a pouch of methamphetamine paste to the house of Steven Verner, a high school friend of Appellant. Appellant and Verner, who lived near McAlester, had not seen each other for several years. Appellant had learned Verner was a drug dealer and sold the methamphetamine paste to Verner for $1,700.00. Verner gave Appellant $400.00 and agreed to pay Appellant the remainder of the money after he sold the methamphetamine. Verner also allowed Appellant and Pelz to stay in his home until he sold the methamphetamine. About a week later, Verner made another $400.00 payment to Appellant and gave him a 9mm Ruger pistol to hold as collateral. Appellant made several attempts to collect his debt without success.

¶3 Frankie Oss testified he had not seen Appellant in six years when Appellant showed up where Oss was living. Appellant told Oss he was living in Stillwater, but was down to collect a debt from Verner and was staying at Verner's home. The night before the shootings, Appellant returned to Oss' house with Pelz and two other men. Appellant told Oss the men were going to assist him in getting his money from Verner and showed Oss the 9mm Ruger. The next day around noon, Appellant found Oss at the Mayfair Motel where he had moved the night before. Appellant told Oss he was going to collect his money from Verner, otherwise he might shoot Verner with his own gun if he did not pay. Oss testified he did not take Appellant seriously, but cautioned him about spending the rest of his life in the penitentiary.

¶4 Steve Armstrong testified that on November 4, 1995, Appellant and Pelz came to his house. Verner also owed Armstrong money for methamphetamine. Armstrong stated Appellant consumed a 12–pack of beer between noon and nine o'clock. He testified Appellant and Pelz left to go to Verner's to

see if Verner had their money. Appellant told Armstrong he was going to "cap the son of a bitch (Verner) so that bitch (Pelz) would shut up and leave him alone."

¶ 5 On the night in question, Appellant went to Verner's home. Verner testified he took Appellant into the kitchen, offered him food and said:

Charles, I know I owe you some money. I do plan to pay you the money. Whatever you think the debt is left, I plan to pay you. I don't have any right now, but I am working. I will be getting a check and you'll be the first one I take care of.

Appellant asked how long it would be before he could pay him back and Verner responded that it would be about two weeks. Appellant replied that was not good enough. He looked at Verner as if he was going to cry and said, "I'm worried about it's down to the point of being or not being." Verner stated he reached out in an attempt to console Appellant and to keep him from crying. He then asked Appellant, "You mean to tell me they're going to kill me over $800.00?" Appellant shoved Verner away, pulled a pistol from inside his shirt and shot Verner in the mouth.

¶ 6 Verner then heard two more shots and thought Appellant had committed suicide in the next room. However, these shots were the ones that eventually killed his friend Michael Sauer who was in the living room watching television. Verner then heard his daughter Lindsay scream, "Daddy, Daddy, help me" and ran into the front room and found Lindsay shot and lying on the floor. Verner looked out the front door of the house and saw Appellant shoot Adrianne N. Smith twice.

¶ 7 Lindsay testified she believed Pelz's car had backfired when she heard the shots. Lindsay exited Pelz's vehicle where she was sitting with her friend Adrianne and started toward the house when she saw Appellant emerge waving a pistol. She attempted to run into the house. As she passed, Lindsay heard him say, "I hope you die, bitch" and then Appellant shot Lindsay in the side of her head.

¶ 8 Adrianne exited the vehicle and began to run away from the house. When she saw Appellant shoot Lindsay, Adrianne attempted to return to aid her friend, but Appellant shot her. While she lay on the ground, Appellant shot her again. Appellant then got into Pelz's car and they sped away.

¶ 9 Michael Sauer telephoned to report the shootings and gave a description of Appellant, his name and a description of the vehicle. Officers Weeks and Busby apprehended Appellant and Pelz after a police chase.

¶ 10 Pelz stepped out of the driver's side and laid down on her stomach. Appellant stumbled out of the passenger's side and started walking off in the wrong direction. Upon his arrest, Appellant complained he had hurt his finger, but declined to be taken to the hospital.

¶ 11 Appellant testified at trial that before he went to Verner's home, he had consumed alcohol and methamphetamine. He admitted having Verner's loaded gun inside his shirt when he knocked on the door, but said he was going to return it upon payment of the money. He also testified when Verner reached out towards him, he became scared, pushed him back, pulled out the gun from within his shirt, and shot him in the face.

¶ 12 He stated that when Verner grabbed his face and fell to the ground, he flipped out and started running towards the door. While running through the living room, Appellant saw movement out of the corner of his eyes and fired twice in the direction of the movement. Outside, he saw two more people running towards him screaming and just started shooting in their direction. He then got into Pelz's car and drove off. Pelz asked him what had happened, but Appellant said he could not remember.

¶ 13 Appellant could not explain why it scared him when Verner put his arm around him. Further, he could not remember telling Lindsay that he hoped she died. Appellant testified he did not aim as he shot, but the gun was just flailing around and he was shooting it at anyone running towards him. He did not remember telling Oss he was going to kill Verner with his own gun.

¶ 14 Other facts will be revealed as they become relevant to the propositions of error.

## JURY SELECTION ISSUES

¶ 15 In his ninth proposition of error, Appellant raises a challenge to jury selection. He contends the prosecution violated *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) by using all but one of its peremptory challenges to strike women and the sole black male. Appellant states in his reply brief there is no record evidence of venireman Emanuel Sexton's race. This was the subject of Appellant's first proposition of error in his Application For Evidentiary Hearing On Sixth Amendment Claims. In our Order remanding for an evidentiary hearing, we found the evidence supporting this claim was in the appellate record and available for review. *Taylor v. State*, 1998 OK CR 64, 972 P.2d 864. Therefore, we found no need for additional evidence to be gathered in an evidentiary hearing.

¶ 16 Upon review of the appellate record, we find the record does not support Appellant's claim that he was tried by a jury selected in violation of the Equal Protection Clause. The final panel consisted of eight women and four men, with an additional male and female as alternates. Additionally, we find no support that Sexton's excusal was racially based. This proposition is denied.

## FIRST STAGE ISSUES

¶ 17 In his first proposition of error, Appellant claims that he was entitled to a first degree manslaughter instruction, although the instruction was not requested by trial counsel. Appellant reasons that because the trial court instructed on voluntary intoxication, the evidence therefore supported a reasonable doubt as to whether he could have formed the specific intent to kill Michael Sauer. Appellant relies on *Tarter v. State*, 1961 OK CR 18, ¶ 34, 359 P.2d 596, 601, where this Court held "[i]n a prosecution for murder, the court should instruct the jury on the law of each degree of homicide which the evidence tends to prove, whether it be requested or not . . . ."

¶ 18 The State responds that the trial court erred in giving the voluntary intoxication instruction because evidence that Appellant had consumed alcohol and amphetamines on the day of the offense was not sufficient evidence upon which to give the instruction. Apart from Steve Armstrong's testimony that he and Appellant shared a 12-pack of beer the day of the shooting frenzy, the only evidence Appellant had taken any drugs or consumed alcohol came from Appellant. Because Appellant was able to give a detailed account of the events and of his conduct, he failed to show he was sufficiently intoxicated to raise a reasonable doubt of his ability to form specific intent.

¶ 19 Voluntary intoxication is not a defense to criminal culpability. 21 O.S.1991, § 153. However, voluntary intoxication has long been recognized as a defense to the crime of First Degree Malice Murder. *White v. State*, 1998 OK CR 69, ¶ 15, 973 P.2d 306, 311, *citing Cheadle v. State*, 11 Okl.Cr. 566, 149 P. 919 (1915). *See also Jackson v. State*, 1998 OK CR 39, ¶¶ 62–66, 964 P.2d 875, 891–892, *cert. denied*, 526 U.S. 1008, 119 S.Ct. 1150, 143 L.Ed.2d 217 (1999). If voluntary intoxication is to be relied upon as an affirmative defense, the defendant must introduce sufficient evidence to raise a reasonable doubt as to his ability to form the requisite criminal intent. *Crawford v. State*, 1992 OK CR 62, ¶ 53, 840 P.2d 627, 638.

¶ 20 Here, Appellant was able to give a detailed account of the events of the night in question. As a result, he failed to demonstrate he was sufficiently intoxicated to raise a reasonable doubt of his ability to form the specific intent to kill. *Charm v. State*, 1996 OK CR 40, ¶¶ 11–12, 924 P.2d 754, 761, *cert. denied* 520 U.S. 1200, 117 S.Ct. 1560, 137 L.Ed.2d 707 (1997); *Valdez v. State*, 1995 OK CR 18, ¶¶ 56, 57, 900 P.2d 363, 379, *cert. denied*, 516 U.S. 967, 116 S.Ct. 425, 133 L.Ed.2d 341 (1995). Accordingly, we find an instruction on voluntary intoxication was not warranted by the evidence and it was error for the trial court to so instruct. Additionally, because Appellant failed to demonstrate he was sufficiently intoxicated to raise a reasonable doubt of his ability to form the specific intent to kill, he

was not entitled to an instruction on first degree manslaughter. *Shrum v. State*, 1999 OK CR 41, ¶ 10, 991 P.2d 1032. This proposition is therefore denied.

¶ 21 In Appellant's second proposition of error, he contends the fifth element of the second degree murder instruction [Instruction Number 17] was defective and warrants reversal of his conviction for first degree murder. The fifth element read as follows: *"Fifth,* the conduct is not done with the intention of taking life **or harming** any particular individual." Both parties recognize the removal of the **"or harming"** language in the Second Edition of the Uniform Criminal Jury Instructions [OUJI–CR 2d 4–91] was ordered by this Court in *Willingham v. State*, 1997 OK CR 62, ¶ 23, 947 P.2d 1074, 1080–81, *cert. denied,* 524 U.S. 930, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998). However, the State contends giving the instruction containing the "or harming" language was harmless error, because in Willingham this Court said that second degree depraved mind murder was not a lesser included offense of first degree murder and the instruction should not have been given at all. Appellant submits he was entitled to the instruction because the evidence supported it.

¶ 22 We disagree. The elements of second degree depraved mind murder are as follows:

1. death of a human;
2. caused by conduct which was imminently dangerous to another person;
3. the conduct was that of the defendant;
4. the conduct evinced a depraved mind in extreme disregard of human life;
5. the conduct is not done with the intention of taking the life of any particular individual.

Appellant testified that as he ran through the living room, he saw movement out of the corner of his eyes and fired in that direction twice, killing Sauer. These facts suggest a design to effect the death of Sauer and therefore do not support a second degree murder instruction. *Cf. Paxton v. State*, 1993 OK CR 59, ¶ 7, 867 P.2d 1309, 1316, *cert. denied,* 513 U.S. 886, 115 S.Ct. 227, 130 L.Ed.2d 153 (1994) (holding second degree murder instruction appropriate only "where there is no premeditated design to kill any particular person."); *Shrum,* 1999 OK CR 41, ¶ 10, 991 P.2d at 1036(holding trial court should only instruct on lesser included and/or related offenses where the evidence warrants giving such an instruction). Accordingly, any error in the language of Instruction Number 17 was harmless beyond a reasonable doubt, because Appellant was not entitled to the instruction at all. *Simpson v. State,* 1994 OK CR 40, ¶ 35–36, 876 P.2d 690, 702; *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705(1967); 20 O.S.1991, § 3001.1. This proposition is denied.

## SECOND STAGE TRIAL ISSUES

¶ 23 In his fourth proposition of error, Appellant contends the evidence was insufficient to sustain the "knowingly creating a great risk of death" aggravating circumstance. This Court has held this aggravator is proven by acts of a defendant "which create a great risk of death to another in close proximity, in terms of time, location, and intent to the killing." *Le v.State,* 1997 OK CR 55, ¶ 33, 947 P.2d 535, 549, *cert. denied,* 524 U.S. 930, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998). "It may be appropriate where only one person is killed, where more than one person is killed, or where more than one person is killed but the murders are not contemporaneous." *Id.* Here, the evidence showed Appellant killed one person and shot three others. This evidence was sufficient to support the jury's finding that Appellant knowingly created a great risk of death to more than one person.

¶ 24 Appellant also argues this aggravating circumstance is vague and overbroad. We have previously rejected similar claims and decline to revisit the issue. *See Douglas v. State,* 1997 OK CR 79, ¶ 98, 951 P.2d 651, 677,*cert. denied,* 525 U.S. 884, 119 S.Ct. 195, 142 L.Ed.2d 159 (1998); *Valdez v. State,* 1995 OK CR 18, ¶ 68, 900 P.2d 363, 382, *cert. denied,* 516 U.S. 967, 116 S.Ct. 425, 133 L.Ed.2d 341 (1995). This assignment of error is denied.

¶ 25 In his fifth assignment of error, Appellant claims there was insufficient

evidence to support the finding of the aggravating circumstance of "avoiding or preventing arrest or prosecution." "The focus of the aggravator that the murder was committed to avoid lawful arrest or prosecution is the state of mind of the murderer; it is he who must have the purpose of avoiding or preventing lawful arrest or prosecution." *Gilbert v. State*, 1997 OK CR 71, ¶ 104, 951 P.2d 98, 122, *cert. denied*, 525 U.S. 890, 119 S.Ct. 207, 142 L.Ed.2d 170 (1998). Further, this aggravator requires a predicate crime, separate from the murder, for which the appellant seeks to avoid arrest or prosecution. *Id. See also Barnett v. State*, 1993 OK CR 26, ¶ 30, 853 P.2d 226, 233. The record clearly supports a finding that Appellant shot Sauer to avoid arrest or prosecution for the attempted murder of Steve Verner. This assignment of error is denied.

¶ 26 In his sixth proposition of error, Appellant complains the trial judge's refusal to answer the jury's question concerning the meaning of life imprisonment without the possibility of parole violated his Sixth, Eighth, and Fourteenth Amendment rights protected by *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). During deliberations, the jury sent out a note which asked, "[i]s there any chance of Charles Taylor getting out of prison if given life without parole? Ever?" The trial court responded with Supplemental Instruction Number 2, which stated, "[y]ou have received all the law and the evidence that is applicable in this case. The court cannot answer any further. /s/ Thomas M. Bartheld [Trial Judge]." Appellant acknowledges we have previously rejected similar claims and declined to revisit this issue. However, he asks this Court to adopt Judge Chapel's dissent in *Mayes v. State*, 1994 OK CR 44, ¶ 137, 887 P.2d 1288, 1325, *cert. denied*, 513 U.S. 1194, 115 S.Ct. 1260, 131 L.Ed.2d 140 (1995). This we decline to do. This proposition is denied.

¶ 27 In his seventh proposition of error, Appellant argues the combined effect of the trial court's refusal to answer the jury's question regarding the meaning of life imprisonment without the possibility of parole, coupled with its giving of Supplemental Instruction No. 3, coerced the jury to return a verdict of guilty.[1] We are not persuaded by Appellant's argument. This Court has ruled on the propriety of and the circumstances when the *Allen* instruction should be given. We find no abuse of discretion. *See Mayes*, 1994 OK CR 44, ¶¶ 126–137, 887 P.2d at 1316 (holding it is not error for the trial court to refuse to define life imprisonment without the possibility of parole) and *Ellis v. State*, 1992 OK CR 45, ¶ 36, 867 P.2d. 1289, 1300, *cert. denied*, 513 U.S. 863, 115 S.Ct. 178, 130 L.Ed.2d 113 (1994) (holding whether to instruct the jury that if a unanimous verdict could not be reached, the jury would be discharged and a sentence of life imprisonment (or life imprisonment without the possibility of parole) would be imposed remains a question directed to the sound discretion of the trial judge, who is in the best position to determine whether the additional instruction would be helpful to a final resolution of the case). We deny this proposition of error.

¶ 28 In his eighth proposition of error, Appellant asserts that Oklahoma's capital sentencing scheme does not meet constitutional standards because, taken as a whole, it does not narrow the class of persons eligible for the death sentence, and in reality allows the sentencer to impose the sentence of death on anyone found guilty of murder in the first degree and violates the Eighth and Fourteenth Amendments to the United States Constitution and Article II, §§ 7 and 9 of the Oklahoma Constitution. Appellant relies on *Tuilaepa v. California*, 512 U.S. 967, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994), where the Supreme Court held capital punishment cases under the Eighth Amendment address two different aspects of the capital decisionmaking process: the eligibility decision and the selection decision. Appellant argues that Oklahoma's capital punishment scheme fails to provide a meaningful eligibility decision, because some of the aggravating circumstances set forth in 21 O.S.1991,

---

1. Supplemental Instruction No. 3 was the *Allen* instruction, based upon *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

§ 701.12 are not only facially vague but also have been interpreted so broadly that they can be applied to anyone convicted of murder in the first degree, thus making that person eligible for a death sentence. Appellant acknowledges our holding in *Romano v. State,* 1993 OK CR 8, ¶¶ 113–116, 847 P.2d 368, 392–393, *affirmed,* 512 U.S. 1, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994) (holding Oklahoma's Statutes and case law, when considered together, provide sufficient guidelines to properly direct prosecutorial discretion whether to seek the death penalty), but argues it is something else entirely for the prosecutor to have unlimited discretion as to death eligibility.

¶ 29 Appellant misreads *Romano,* where this Court, relying on *Bordenkircher v. Hayes,* 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978), specifically acknowledged that prosecutorial discretion was not unlimited. There, we addressed limitations on prosecutorial discretion in the context of a state constitutional violation, holding "[l]imits on this discretion exist by virtue of the statutory schemes governing criminal law as well as those governing the practice of law." *Romano,* 1993 OK CR 8, ¶¶ 114, 115, 847 P.2d at 393. In light of *Romano,* we continue to find Oklahoma's capital sentencing scheme constitutional. This assignment of error is denied.

¶ 30 For his tenth proposition of error, Appellant contends that admission of the victim impact witness' recommendation of a sentence of death was an unconstitutional infringement of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. An opinion as to the appropriate punishment is permissible under 22 O.S.1991, § 984(1). In *Ledbetter v. State,* 1997 OK CR 5, ¶ 31, 933 P.2d 880, 890–891, we held this evidence will be viewed by this Court with a heightened degree of scrutiny and we will weigh the probative value of such evidence against its prejudicial effect. "Any opinion as to the recommended sentence should be given as a straightforward, concise response to a question asking what the recommendation is; or a short statement of recommendation in a written statement, without amplification."

*Id.* Such was done in this case, and we find no error.

## INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

¶ 31 In Proposition III, Appellant raises the following instances of deficient performance to support his ineffective assistance of counsel claim:

A.   Trial counsel failed to make any opening statements, failed to file significant motions, failed to effectively cross-examine key witnesses, failed to make significant objections, failed to make significant closing arguments in support of defense theories, and thus prejudice is presumptive from trial counsel's failure to subject the prosecution's case to meaningful adversarial testing, violating Appellant's Sixth Amendment Rights to effective counsel.

B.   Trial counsel failed utterly to present available evidence to support its guilt phase defense, to make obvious cross-examination to support this defense, and to make effective arguments to the jury in support of this defense.

  1)  Failure to use eyewitness evidence of intoxication from preliminary hearing.

  2)  Misuse of and failure to exploit the defense's sole expert witness, who was employed only at the last moment.

C.   Trial counsel failed to utilize and argue the available defense of depraved mind murder in order to negate the State's evidence of specific intent, which had strong available evidence to sustain it, and which was the appropriate defense for murder in the second degree.

D.   Closing arguments of trial counsel were fundamentally and prejudicially deficient.

E.   Trial counsel failed to use impeachment evidence against Lindsay Verner.

F.   Trial counsel failed to be effective by not objecting to the trial court's sup-

plemental instructions on the issues of life without parole and jury deadlock.

G. Trial counsel though cognizant of the opportunity, failed to seek discovery of Steve Verner's Mac–11 gun, which Verner claimed had been taken to his sister's house three days before the crime, in order to test it for having been fired on the night of the shootings.

H. Trial counsel was ineffective for having Appellant testify in the context of other representational failures, and failed to adequately prepare Mr. Taylor to testify or to match the purpose of his testimony with the appropriate stage of trial.

I. Trial counsel failed to seek a change of venue despite high word of mouth and community feeling. This should at least have been done after *voir dire*, wherein many were excused for cause.

J. Trial counsel failed to call any mitigation witnesses other than Dr. Sharp when more were available.

¶ 32 Appellant filed an application for an evidentiary hearing, pursuant to Rule 3.11(B)(3)(b), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (1998) to investigate his allegations of ineffective assistance of counsel. On December 1, 1998, we remanded this matter to the District Court of Pittsburg County for an evidentiary hearing on the fourth[2] and fifth[3] claims raised in Appellant's application. *Taylor*, 1998 OK CR 64, 972 P.2d 864. Pursuant to that Order, an evidentiary hearing was conducted on February 22–23, 1999, and Judge Thomas Bartheld filed Findings of Fact and Conclusions of Law in this Court on April 28, 1999. The trial court found, *inter alia*, that trial counsel's reasons for trying the case in the manner it was tried was sound trial strategy.

¶ 33 This Court will give the trial court's findings strong deference if supported by the record, but we shall determine the ultimate issue whether trial counsel was ineffective. Rule 3.11(B)(3)(iv), *Rules of the Court of Criminal Appeals*, 22 O.S.Supp.1995, Ch. 18, App (1998); *Wood v. State*, 1998 OK CR 19, ¶ 63, 959 P.2d 1, 16. After review and consideration of the record, we find the trial court's findings and conclusions are supported by the record and we shall address Appellant's ineffective assistance of counsel claim in accordance therewith.

¶ 34 To prevail on a claim of ineffective assistance of counsel, Appellant must overcome the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance by showing: [1] that trial counsel's performance was deficient; and [2] that he was prejudiced by the deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). *See also Spears v. State*, 1995 OK CR 36, ¶ 54, 900 P.2d 431, 445, *cert. denied*, 516 U.S. 1031, 116 S.Ct. 678, 133 L.Ed.2d 527 (1995). One alleging prejudice must show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. *See also Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180(1993). If this court can dispose of an ineffective assistance of counsel claim on lack of prejudice, we need not determine whether counsel's performance was deficient. *Grady v. State*, 1997 OK CR 67, ¶ 8, 947 P.2d 1069, 1072, overruled on other grounds by *Fairchild v. State*, 1999 WL 1138585. We have also held that we will not second guess counsel's trial strategy. *Welch v. State*, 1998 OK CR 54, ¶ 83, 968 P.2d 1231, 1252, *cert. denied*, —— U.S. ——, 120 S.Ct. 83, 145 L.Ed.2d 70 (1999).

¶ 35 At the evidentiary hearing, trial counsel articulated his trial strategy, stating the case was not a "who done it" case and, without dispute, Appellant was under the

---

2. In his fourth claim, Appellant asserted trial counsel was ineffective for failing to employ psychologist Bill Sharp earlier in his trial preparation,and once employed, failed to maximize Dr. Sharp's expert assistance.

3. In his fifth claim, Appellant contended he was poorly prepared to testify and that trial counsel's anger at his failure to demonstrate sufficient remorse influenced trial counsel in withholding mitigation testimony of ready and willing witnesses.

influence. Trial counsel believed the fact Appellant did not know Michael Sauer "fit right into the fact" that Appellant really had no motive to kill him. His long range strategy was to be credible and to be consistent. Trial counsel stated his strategy was "trying to escape specific intent factually and testimonially" and to rise and fall on "[o]ur credibility and the ability of the jury to see that a man that's on drugs—had been on them—a long-running history with them-could make a mistake and could be screwed up on a given day and make a bad mistake."

¶ 36 Trial counsel testified he did not use his expert witness as a first stage witness as part of his trial strategy because he felt it would diminish the testimony to put it on at both stages. Additionally, trial counsel testified the defense raised in the trial was not voluntary intoxication in the "literal, absolute sense." Trial counsel's defense was to eliminate malice aforethought by arguing the defendant had no knowledge of the deceased and shot him as a reflex. Trial counsel testified he put on Dr. Sharp during second stage to mitigate Appellant's acts through his drug dependency.

¶ 37 In *Boltz v. State*, 1991 OK CR 1, ¶ 32, 806 P.2d 1117, 1126, *cert. denied*, 502 U.S. 846, 112 S.Ct. 143, 116 L.Ed.2d 109 (1991), we quoted *United States v. Glick*, 710 F.2d 639, 644 (10th Cir.1983), *cert. denied*, 465 U.S. 1005, 104 S.Ct. 995, 79 L.Ed.2d 229 (1984):

"[A]n attorney who makes a strategic choice to channel his investigation into fewer than all plausible lines of defense upon which he bases his strategy are reasonable and his choices on the basis of those assumptions are reasonable...." An attor-

ney's decision not to interview witnesses and to rely on other sources of information, if made in the exercise of professional judgment, is not ineffective counsel.

With the aforesaid in mind, we address Appellant's claims.

■ ¶ 38 First, Appellant argues trial counsel was ineffective for waiving opening statement at both stages of trial, thereby failing to tell the jury what the defense theory of the case was or to tell the jury why they should spare Appellant's life. At the evidentiary hearing, trial counsel testified he could not say why he waived opening statement in either stage of trial. Whether to make an opening statement in any case is a strategic decision counsel must make. Here, Appellant cannot show that trial counsel's "failure" to make an opening statement was prejudicial or that the decision not to make an opening statement had an outcome on the verdict.

■ ¶ 39 Next, Appellant relies on *Cronic*,[4] to support his claim trial counsel was ineffective for failing to cross-examine nine of thirteen witnesses. Appellant argues none of the surviving witnesses were cross-examined despite the availability of impeachment and other credibility evidence. In particular, he points out evidence going to the credibility of witnesses Steve Armstrong and Lindsay Verner. Considering trial counsel's strategy to plea for mercy, his decision not to attack the credibility of an adolescent child victim whom Appellant had shot through the head and the other victims was not deficient performance. Additionally, we find trial counsel's decision not to impeach Steve Armstrong[5] to be consistent with his trial strategy.

---

4. *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 2048, 80 L.Ed.2d 657 (1984) (holding if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable.) No specific showing of prejudice was required in *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), because the petitioner had been "denied the right of effective cross-examination" which "would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it." *Id.*, at 318, 94 S.Ct., at 1111).

5. Appellant complains that Armstrong's trial testimony was inconsistent with his preliminary hearing testimony and that trial counsel failed to impeach him with same. At the preliminary hearing, Armstrong testified he and Appellant had both engaged in shooting methamphetamine by injection several times. Armstrong testified, " ....prior to that, Charlie-he was not mad about nothing, because like I said, we'd had a good day. We had been laughing and joking about everything." This included drinking beer, shooting speed, and firing Armstrong's .38 pistol out in the yard. Armstrong indicated that Appellant's demeanor was humorous about the prospects of collecting his debt as he left with Pelz.

¶ 40 Because of our rulings in Propositions II, VI and VII, supra, we find trial counsel was not ineffective for failing to use evidence to support second degree depraved mind murder and for failing to object to Supplemental Instructions 2 and 3.

¶ 41 We next address Appellant's claim regarding trial counsel's misuse of and failure to fully utilize the defense's sole expert witness Dr. Bill Sharp, a clinical psychologist and Executive Director of the Norman Alcohol and Chemical Dependency Center. This was one of the issues remanded for evidentiary hearing. At the evidentiary hearing, the testimony established that trial counsel made "an emergency request" of Dr. Bill Sharp to provide expert assistance in this case. Trial counsel did not specify how he wanted to utilize Dr. Sharp. Dr. Sharp was not provided with prior records which would have corroborated information provided him by Appellant. Dr. Sharp was still administering tests to Appellant on the first day of trial. He wrote his report on the second day of trial and faxed it to trial counsel. Dr. Sharp met with trial counsel on the third day of trial after the first stage. Dr. Sharp testified, "[i]t was not until I came down and participated in the trial [that I understood the terms first and second stage]. And then after the fact, I wondered to myself why I hadn't been used earlier." Dr. Sharp testified that had he been utilized, he could have provided information tending to prove Appellant "did not have the capacity to form the intent in terms of committing the murder."

¶ 42 At the evidentiary hearing, Dr. Sharp provided substantial testimony on the effects of the alcohol, methamphetamine, and cannabis, singly and in combination. Additionally, he related the witnesses' accounts of Appellant's behavior[6] at the time of the offenses with the medically described symptoms of acute methamphetamine intoxication. Dr. Sharp described one such symptom as disassociation, wherein "[t]he individual would remember details of the events. But because of the delusions they're experiencing, the impulsivity, the sense of just reacting and not planning, they wouldn't understand why they were doing what they were doing. They would remember it, they just wouldn't understand why."

¶ 43 Trial counsel testified at the evidentiary hearing that, despite the lateness of Dr. Sharp's hiring, he never felt he was unable to get what he wanted from Dr. Sharp and he never considered using Dr. Sharp as a first stage witness. It was part of his trial strategy not to do so, because it would diminish his testimony to put it on at both stages. When asked if it occurred to him that Dr. Sharp's expertise might be of use in establishing a voluntary intoxication defense, trial counsel stated he did not recall. With regard to utilizing Dr. Sharp to establish the lack of premeditation, trial counsel stated it must not have occurred to him or he would have called Dr. Sharp. However, trial counsel testified he did not think the testimony of an expert such as Dr. Sharp regarding the effects of drugs on the brain and behavior would have any impact on *mens rea* in the guilt/innocence phase of trial. In view of trial counsel's belief that using Dr. Sharp in the first stage would diminish his testimony in the second stage, we find trial counsel's strategic choice not to use Dr. Sharp in the first stage of trial to be reasonable.

¶ 44 Next, a review of the record reveals that during the second stage of trial, the prosecutor moved for adoption of the first stage evidence without objection and Dr. Karl Sauer, the murder victim's father, was allowed to give a victim impact statement. Appellant's sole mitigation evidence came

---

Appellant told Armstrong that he was going to Verner's house to "see if there was any money, which we kind of laughed because we knew that there—you know—there was no money or nothing like that." Armstrong recalled Pelz joking with him that "we ought to shoot the son of a bitch, but we can't get no money out of him that way." Armstrong stated this was said in a laughing and joking manner; that he was a friend of Verner; and if he had thought they were serious, he would not have let them leave his house, or would have warned Verner. Armstrong stated that he knew there was no harm intended; he knew Appellant and could not have believed he would seriously harm anyone.

6. The preliminary hearing testimonies of Steve Armstrong and Steve Verner were also considered by Dr. Sharp.

from the testimony of Dr. Bill Sharp. He testified during second stage from the report of his findings. Those findings included that Appellant took his first drink of alcohol at the age of five or six years old and that he was drinking every weekend by the time he was a teenager. From the age of twenty-one, Appellant was drinking on a daily basis. Over a period of twelve to fourteen years, Appellant was arrested for D.U.I. six times. Appellant began to ingest methamphetamines at age twenty-one and was soon injecting himself daily.

¶ 45 Dr. Sharp testified Appellant suffered from blackouts, was clearly chemically dependent on alcohol, amphetamines, and marijuana, and would remain so for the rest of his life. He also testified that the three injections of methamphetamine Appellant took on the day of the shootings resulted in acute amphetamine intoxication based on a near poisonous dose. Dr. Sharp stated that when this happens, individuals go past paranoia into a very intense state of aggression and suspicion. He stated "their behavior is violent and in short they're a walking time bomb."

¶ 46 Dr. Sharp added that consuming whiskey and injecting amphetamines can cause volatile mood changes from one minute to the next without explanation and causes people suffering from these effects to have an extra sensitive startle response or reflex. He characterized Appellant as having clinical borderline depression, being guilty and full of remorse, and as not having been competent when he committed the crime. He expressed great hope for Appellant's rehabilitation.

¶ 47 We find Dr. Sharp's second stage testimony to be substantially the same as his testimony at the evidentiary hearing. Had the jury been persuaded by Dr. Sharp's testimony that Appellant's acute intoxication would have negated his ability to form the specific intent to kill or that such acute intoxication so sensitized his startle reflex, we believe the jury would not have imposed the death penalty but would have arrived at a "compromise" verdict. *Compare Dennis v. State*, 1977 OK CR 83, ¶ 21, 561 P.2d 88, 94. Considering the jury's imposition of the sentence of death, we additionally find Dr.

Sharp's testimony would not have affected the outcome of the first stage.

¶ 48 Next, Appellant offers the following as examples of trial counsel's deficient closing argument in both stages:

1. Failure to argue that Appellant had no intent to kill;

2. Failure to argue second degree depraved mind murder;

3. Undermining Appellant's defenses by stating he did not know what Appellant's mental condition was at the time of the crime, but that his brain was generally "shot;" by stating he didn't "have to argue to you about the intoxication factor in his mind" because Appellant was generally a product of drugs; and by stating Appellant "needed the money; didn't know what to do:"

4. Failure to clarify or otherwise contravert the avoid-arrest aggravator and the great risk of death to more than one person aggravator; and

5. Failure to make any substantive argument against the death penalty beyond a plea for mercy.

Regarding these instances, we have previously found trial counsel's decision to show remorse and credibility on Appellant's part in the first stage and to plea for mercy in the second stage to be a sound and valid trial strategy which we will not second guess.

¶ 49 As to Appellant's argument that trial counsel was ineffective for failing to seek discovery of Steve Verner's Mac–11 gun to test it to see if it was fired on the night of the shootings, Appellant has offered no evidence that would have exculpated him. On the contrary, Appellant admitted he shot the victims. Where there is no prejudice, we will not find deficient performance. *Grady*, 1997 OK CR 67, ¶ 8, 947 P.2d at 1072.

¶ 50 Appellant's claim he was not adequately prepared to testify or that trial counsel failed to match the purpose of his testimony with the appropriate stage of trial was remanded for evidentiary hearing. At the evidentiary hearing, trial counsel testified he did not recall preparing or discussing Appellant's testimony beforehand or prepar-

ing him for cross-examination. He stated "I didn't spend time with games with him— trying to—so he could bob and weave ... cross-examination was the least of my problems." In light of counsel's stated trial strategy to allow Appellant to testify to show credibility and remorsefulness, we find no amount of preparation can make a person show remorse and too much preparation could likely cause the jury to find his testimony not credible. Under these circumstances, we find no merit in this argument.

¶ 51 Appellant next argues trial counsel was ineffective, because he did not seek a change of venue despite high word of mouth publicity and community feeling. Appellant notes that, of the twelve out of thirty-six jurors excused for cause, nine were excused for reasons related to their affinity for the victims. He thus contends that when so many venire persons excused themselves for cause and when the victims were from well-known and prominent families, trial counsel should have moved for a change of venue.

¶ 52 The record shows those venire persons affected by word of mouth and community feeling were properly removed from the panel. There is nothing in the record to support Appellant's claim that any of the twelve jurors who actually served were so influenced. We find no deficient performance of counsel here.

¶ 53 Appellant next claims that trial counsel was ineffective for failing to call additional available mitigation witnesses in second stage. This claim was remanded for evidentiary hearing. At the evidentiary hearing, ten witnesses testified. Five of them (Appellant's sister, nephew, paternal aunt, former supervisor at Frontier Engineering and a friend of sixteen years) were subpoenaed and available at trial, but were not called to testify. Two other witnesses (a former co-worker and girlfriend, and a Christian minister) were contacted and expressed a willingness to testify, but were not ever subpoenaed. The other three witnesses who testified at the evidentiary hearing were never contacted, but stated they would have testified if asked. These witnesses were a former supervisor and two individuals who were formerly supervised by Appellant. Each of

these witnesses would have testified to evidence of Appellant's character much different from the person who was under the influence of an alcohol-drugs combination and/or suffering from acute methamphetamine intoxication.

¶ 54 Trial counsel stated his decision not to use mitigation witnesses was influenced by two factors beyond his control: 1) Appellant's refusal to testify in the second stage and 2) Appellant's mother's attitude which was"one of failure to accept responsibility for this." Trial counsel testified at the evidentiary hearing that he felt calling "a bunch of ancillary relatives, employees, co-employees, or employer that were going to say things like, '[h]e was a good friend of mine,' only pointed out the absence of his mother and him on the stand in my mind." When asked if he had any idea what these witnesses would have testified to if utilized, trial counsel stated he "[d]idn't care what any of them say (sic)." Again, he reasoned that by not putting on any lay witnesses, the jurors might think that only an expert testifies in second stage and other people are not called to testify. Trial counsel added that he would not have put on witnesses who would testify they used drugs with Appellant, because he did not see how that would benefit Appellant's case.

¶ 55 Under these circumstances, where Appellant admitted he committed the offenses, apparently without much remorse, while under the influence of a drug/alcohol combination and where trial counsel believed Appellant's mother still did not believe he committed the offenses, we find trial counsel's decision to present only his expert witness was a reasonable second-stage strategy. Having found trial counsel's decisions to be consistent with his trial strategy, Appellant's claim of ineffective assistance of counsel is denied.

## MANDATORY SENTENCE REVIEW

¶ 56 Pursuant to 21 O.S.1991, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the evidence supports

the jury's finding of aggravating circumstances as enumerated in 21 O.S.1991, § 701.12. We shall first determine whether the evidence was sufficient to support the imposition of the death penalty.

¶ 57 The jury found the following aggravators:

1. The defendant knowingly created a great risk of death to more than one person; and

2. The murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution.

As discussed previously, each of these aggravating circumstances was supported by sufficient evidence. The trial court summarized the mitigating evidence into eight factors and submitted them to the jury as follows:

1. The Defendant did not have any significant history of prior violent criminal activity;

2. The Defendant's capacity to appreciate the criminality of his conduct to the requirements of law was impaired by drugs and/or alcohol;

3. The Defendant was under the influence of emotional disturbance;

4. The Defendant acted under circumstances which tended to reduce the crime;

5. The Defendant is likely to be rehabilitated;

6. The Defendant's age;

7. The Defendant's character; and

8. The Defendant's emotional/family history.

In addition, you may decide that other mitigating circumstances exist, and if so, you should consider those circumstances as well.

¶ 58 Upon our review of the record and careful weighing of the aggravating circumstances and the mitigating evidence, we find the sentence of death to be factually substantiated and appropriate as to Count I, first degree murder. Based on the record before this Court, we cannot say the jury was influenced by passion, prejudice, or any other arbitrary factor contrary to 21 O.S.1991, § 701.13(C), in finding that the aggravating circumstances outweighed the mitigating evidence. Accordingly, finding no error warranting reversal or modification, the **JUDGMENT** and **SENTENCE** for First Degree Murder is **AFFIRMED**.

## Decision

¶ 59 The conviction and sentence for Count I, Murder in the First Degree, is hereby **AFFIRMED**. The convictions and sentences for Counts II–IV, Shooting with Intent to Kill, are hereby **AFFIRMED**.

LILE, J.: concurs.

LUMPKIN, V.P.J.: specially concurs.

STRUBHAR, P.J., and CHAPEL, J.: concur in part/dissent in part.

STRUBHAR, Presiding Judge: concurs in part/dissents in part.

¶ 1 I concur in affirming the Judgment but dissent in the affirming of the Sentence.

¶ 2 I find merit in Propositions three and six and would reverse and remand to the trial court for a new sentencing hearing.

¶ 3 In Proposition three the Appellant alleges that his trial counsel was ineffective and this ineffectiveness severely prejudiced Appellant's defense. I agree.

¶ 4 The trial judge, as alleged in Proposition six, refused to answer the jury's question concerning the meaning of life imprisonment without parole. I continue to believe that this Court should mandate an appropriate answer to that jury question.

LUMPKIN, Vice Presiding Judge: specially concurs:

¶ 1 I agree with the decision to affirm the judgments and sentences but write separately to address further the claims of ineffective assistance of counsel. In its Findings of Fact and Conclusions of Law from the evidentiary hearing on Sixth Amendment grounds, the District Court noted:

Mr. Elliott had a very difficult case to handle. Mr. Elliott had to represent a defendant who had gone to a residence armed with a semi-automatic pistol, to col-

lect drug/methamphetamine money. The jury saw the witnesses and heard their testimony. The jury heard that Michael Sauer was shot twice in the back, that the defendant had shot his friend, Steve Verner, in the mouth, and had shot two young girls. One of whom, Lindsey Verner, testified the defendant said "I hope you die bitch" just prior to shooting her in the head. As Mr. Elliott testified this was not a "who done it" case.

¶2 In reviewing a claim of ineffective assistance of counsel, counsel's conduct is to be evaluated from counsel's perspective at the time of trial. *Strickland v. Washington,* 466 U.S. 668, 669, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674; *Phillips v. State,* 1999 OK CR 38, ¶124, 989 P.2d 1017; *Le v. State,* 947 P.2d 535, 556 (Okl.Cr.1997), *cert. denied,* 524 U.S. 930, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998); *McGregor v. State,* 885 P.2d 1366, 1381 (Okl.Cr.1994), *cert. denied,* 516 U.S. 827, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995). In this case, counsel's defense was that Appellant did not possess the requisite malice aforethought for first degree murder because he did not know the victim, did not have any dealings with him and had no reason to kill him. This defense rested on Appellant's credibility and lack of remorse. Any testimony by Dr. Sharp as to Appellant's level of intoxication was not relevant to this defense. The argument is made by the defense that there are differing levels of intoxication, and that Appellant suffered from a level of intoxication wherein he could remember the details of the offense but he was only acting out of reflex and should not be held responsible for his conduct. While support for this theory may be developing, it is not the state of the law at this time. A defense of voluntary intoxication requires that a defendant, first, be intoxicated and, second, be so utterly intoxicated, that his mental powers are overcome, rendering it impossible for a defendant to form the specific criminal intent or special mental element of the crime. *Jackson v. State,* 964 P.2d 875, 892 (Okl.Cr.1998), *cert. denied,* 526 U.S. 1008, 119 S.Ct. 1150, 143 L.Ed.2d 217 (1999). Here, the evidence did not support the defense of voluntary intoxication. In light of Appellant's detailed memory of the events surrounding the shooting,

Dr. Sharp's testimony concerning any intoxication would not have supported a voluntary intoxication defense in first stage. Therefore counsel's decision not to put Dr. Sharp on the witness stand in first stage was a reasonable decision based upon counsel's professional judgment.

¶3 As for second stage, counsel was left with a defendant who had not shown any remorse and would not testify in second stage, and the defendant's mother who rejected any notion of responsibility. Other potential mitigating witnesses testified at the evidentiary hearing or in sworn affidavits that Appellant did not commit the crimes charged or that the Charles Taylor they knew would not have committed the crimes charged except for the fact that he was under the influence of drugs. The decision not to put on this type of evidence, in the absence of any testimony from Appellant or his mother, was reasoned trial strategy. As the state did not present any new evidence in the second stage, counsel's decision to only put Dr. Sharp on the witness stand and make the jury believe that only expert testimony was appropriate in that part of the trial was a reasonable plea for mercy.

¶4 Considering all the circumstances of this case, counsel's reasons at the time of trial for trying the case in the manner it was done was sound trial strategy which presented as viable a defense as was available to Appellant under the facts of the case and thus fulfilled the function of making the adversarial testing process work. While other strategies might have been equal to or better than the one chosen by trial counsel, that is not the issue. Counsel made reasoned choices at the time of trial. Those choices did not render the trial unfair and the verdict rendered suspect or unreliable. *Lockhart v. Fretwell,* 506 U.S. 364, 372, 113 S.Ct. 838, 844, 122 L.Ed.2d 180 (1993).

CHAPEL, Judge, concurring in part and dissenting in part:

¶1 I concur in affirming the conviction in this case. However, I dissent to the decision affirming the sentence. There was never much, if any, doubt about Taylor's guilt. His

only chance was to persuade the jury to sentence him to something less than death. As it turned out, he had no chance because his lawyer failed him. His counsel failed to make an opening statement and essentially failed to present any evidence despite the fact that several individuals on the witness list were present and willing to testify in mitigation. In a case where the only reasonable strategy was to attempt to convince the jury to spare Taylor's life, the jury heard nothing to offset the State's evidence. This failure was compounded by the trial court's refusal to answer the jury's question about the meaning of life without parole.[1] The jury heard no reason to spare Taylor's life and understandably wanted to make sure he would not be out on the street. I would remand the case for a new sentencing hearing.

---

1. I have consistently stated that the jury should be informed of the meaning of life without parole. *See, e.g., Ochoa v. State,* 1998 OK CR 41, 963 P.2d 583, 605 n. 100; *Mollett v. State,* 1997 OK CR 28, 939 P.2d 1, 15 (Chapel, J., concurring in result); *Johnson v. State,* 1996 OK CR 36, 928 P.2d 309, 321(Chapel, J., specially concurring); *Smallwood v. State,* 1995 OK CR 60, 907 P.2d 217, 239, *cert. denied,* 519 U.S. 980, 117 S.Ct. 431, 136 L.Ed.2d 330 (1996) (Chapel, J., specially concurring); *McGregor,* 885 P.2d at 1383 n. 59(concurring by reason of stare decisis). This is a perfect example of a case where a properly informed jury might have imposed life without parole rather than the death penalty.