**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 26 2001**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENGTH CIRCUIT

BRYAN ANTHONY TOLES,

    Petitioner-Appellant,

       v.

GARY GIBSON, Warden, Oklahoma
State Penitentiary,

    Respondent-Appellee.

No. 00-6337

**Appeal from United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. CIV-98-1378-C)**

James L. Hankins, Hankins Law Office, Enid, Oklahoma, for the appellant.

Robert L. Whittaker, Assistant Attorney General (W.A. Drew Edmondson, Attorney
General, with him on the brief), Oklahoma City, Oklahoma, for the appellee.

Before **EBEL**, **HENRY**, and **BRISCOE**, Circuit Judges.

**BRISCOE**, Circuit Judge

    Petitioner Bryan Anthony Toles, an Oklahoma state prisoner convicted of four

felony counts, including two counts of first degree malice aforethought murder for which

he received two death sentences, appeals the district court's denial of his 28 U.S.C.

§ 2254 petition for writ of habeas corpus. We exercise jurisdiction pursuant to 28 U.S.C.

§ 1291 and affirm.

I.

The facts of Toles' crimes were summarized by the Oklahoma Court of Criminal

Appeals (OCCA) in disposing of Toles' direct appeal:

> The events which culminated in the murder of Juan Franceschi and his fifteen year old son, Lonnie, began shortly after midnight on July 16, 1993. Bryan Toles, David Flowers and Casey Young walked past the Franceschi home in Lawton and decided to steal a car. The men were on their way from the Honeymooners Bar to the home of their friend, Herbie Foster, and they were tired of walking. None of them knew how to hot-wire the red Mustang 5.0 in the Franceschi's driveway, so they had to get the keys.
>
> Toles rang the doorbell while Young and Flowers hid around the corner and put bandannas over their faces outlaw-style. Young had already loaded a .22 revolver and given it to Toles.
>
> Toles pushed his way into the home when Lonnie opened the door. He pointed the pistol at Lonnie and told him to get down and shut up. Young and Flowers went down the hall toward the bedrooms. Norma Franceschi heard the commotion and met them in the hall. She screamed for her husband and continued toward the front door. Juan Franceschi struggled briefly with Young and Flowers in the hall and joined his wife. Toles, who had been kicking Lonnie, shot Juan Franceschi in the arm.
>
> Toles followed Mr. and Mrs. Franceschi as they retreated toward the bedroom. He aimed at Mr. Franceschi's head, but before he could fire, Mrs. Franceschi grabbed his arm. Thinking that Mr. Franceschi could identify him, and that he "might as well go ahead and kill him," Toles aimed at Franceschi's chest and shot. Even though he was shot, Franceschi fought with Toles in the hallway. Toles' pants became soaked with Franceschi's blood during the fight. Mrs. Franceschi escaped to their grown daughter's bedroom, hiding first in the closet, and then in the drawer of a waterbed. She heard someone come into the room and leave.
>
> Meanwhile Lonnie Franceschi was still kneeling on the floor near

the front door with his hands behind his back. Toles saw Lonnie on his way out of the house and thought, "damn, there's still him left." Realizing Lonnie could identify him, Toles turned, extended his arm so the barrel of the pistol was about six inches from the back of Lonnie's head, and fired.

After Toles, Young and Flowers left, Lonnie went to his bedroom and got in bed. His mother heard him crying and gasping for air. When she tried to call 911 from the back bedroom, she discovered the phone was dead and ran to a neighbor's home to call. Paramedics arrived shortly and placed Lonnie on life support. Juan Franceschi died while the paramedics worked on him. Later that day Lonnie was declared brain dead, removed from life support and allowed to die.

After they left the Franceschi home, Toles, Young and Flowers walked two blocks to the home of a friend who gave them a ride to Herbie Foster's. Toles gave his bloody clothes to a runaway girl who was staying there and told her to burn them. He called a family friend and told her and her boyfriend that he shot two people. He then spent the night at the home of another friend. He was arrested later that afternoon while he was talking to his mother on a pay phone at the corner of 17th Street and Gore in Lawton.

Toles v. State, 947 P.2d 180, 184 (Okla. Crim. App. 1997) (Toles I). Following his arrest, Toles agreed to talk to the police. During his first interview, he admitted entering the Franceschi home with David Flowers and Casey Young, but insisted that Young was actually responsible for the murders. During three subsequent interviews, all of which were videotaped, Toles admitted carrying the gun into the Franceschi home and shooting Juan and Lonnie Franceschi.

Toles was charged in the District Court of Comanche County, Oklahoma, with five felony counts. Counts I and II charged him with first degree malice aforethought murder in the deaths of Juan and Lonnie Franceschi. Count V charged Toles with conspiracy to commit robbery in the first degree after former conviction of a felony. Count VI charged

3

Toles with attempted robbery in the first degree after former conviction of a felony. Count VII charged Toles with feloniously carrying a firearm. The state also filed a bill of particulars alleging the existence of four aggravating circumstances: (1) that Toles knowingly created a great risk of death to more than one person; (2) the murders were especially heinous, atrocious or cruel; (3) the murders were committed for the purpose of avoiding or preventing a lawful arrest or prosecution; and (4) the existence of a probability that Toles would commit criminal acts of violence that would constitute a continuing threat to society.

The case proceeded to trial in September 1994. At the conclusion of the first-stage proceedings, the jury found Toles guilty of the two murder counts, conspiracy to commit robbery in the first degree after former conviction of a felony, and feloniously carrying a firearm. The jury found Toles not guilty of attempted robbery in the first degree after former conviction of a felony.[1] At the conclusion of the second-stage proceedings, the jury found the existence of all four of the aggravating circumstances alleged by the prosecution. Based upon the existence of those factors, the jury recommended sentences of death on each of the two murder counts, twenty years on the conspiracy charge, and ten

---

[1] The robbery charge was based on the fact that, after the murders were committed, Mrs. Franceschi was unable to locate a checkbook and a compact disc case that allegedly contained $200 in cash and two airline tickets. The state's evidence on the robbery charge, however, was fairly weak. Only one witness testified to seeing Toles with cash immediately after the murders. No witnesses observed Toles or his co-conspirators with the CD case, the checkbook, or the airline tickets.

4

years on the firearm charge.  The trial court imposed the recommended sentences on October 27, 1994.

The OCCA affirmed Toles' convictions and sentences on direct appeal.  Toles I, 947 P.2d at 184, 194.  Toles filed a petition for rehearing, which the OCCA denied. Toles subsequently filed a petition for writ of certiorari, which was denied by the United States Supreme Court.  Toles v. Oklahoma, 524 U.S. 958 (1998).  Toles filed an application for post-conviction relief with the OCCA in September 1997.  That application was denied by the OCCA, and there is no indication in the record that Toles attempted to file a petition for writ of certiorari with the United States Supreme Court.

On October 2, 1998, Toles sought post-conviction relief in federal district court by filing a pro se motion for appointment of counsel and a request to proceed in forma pauperis.  Toles' motions were granted by the district court and, on April 15, 1999, Toles' appointed counsel filed a petition for writ of habeas corpus asserting eight grounds for relief.  On August 29, 2000, the district court denied Toles' petition.  The district court granted Toles a certificate of appealability (COA) with respect to four of the eight issues raised in his habeas petition.  Toles, however, has chosen to pursue only three of those four issues on appeal.

## II.

Because Toles' federal habeas petition was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), it is governed by the

5

provisions of the AEDPA. Wallace v. Ward, 191 F.3d 1235, 1240 (10th Cir. 1999), cert. denied, 530 U.S. 1216 (2000). Under the AEDPA, the appropriate standard of review for a particular claim hinges on the treatment of that claim by the state courts. If a claim was not decided on the merits by the state courts (and is not otherwise procedurally barred), we may exercise our independent judgment in deciding the claim. See LaFevers v. Gibson, 182 F.3d 705, 711 (10th Cir. 1999). In doing so, we review the federal district court's conclusions of law de novo and its findings of fact, if any, for clear error. Id. If a claim was adjudicated on its merits by the state courts, the petitioner will be entitled to federal habeas relief only if he can establish that the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d)(2).

III.

*Denial of funding for neuropharmacologist*

Toles, citing Ake v. Oklahoma, 470 U.S. 68 (1985), contends his due process rights were violated because he was denied funding to present expert testimony at trial in support of his voluntary intoxication defense.

During preparation for trial, Toles' defense counsel retained Dr. Jonathan Lipman, a neuropharmacologist based in Illinois, to assist in the preparation of a voluntary

6

intoxication defense. Lipman interviewed Toles, examined the available evidence (e.g., the videotaped statements Toles gave to the police, interviews with other witnesses), and prepared a written report that he provided to defense counsel. In his report, Lipman stated that, during his interview with Toles, he "learned that [Toles] consumed - smoked - eight 'rocks' of crack cocaine in the four hours preceding the killing[s]." Lipman Memo at 1. The report further opined that Toles "had a blood alcohol concentration of about 590 mg/dl at the time of the crime." Id. The report concluded by stating:

> My opinion of the neuropharmacological influences acting upon [Bryan] Toles during the conduct that led to the killings of Lonnie and Juan Franceschi is that he was so massively intoxicated under the combined influence of cocaine and alcohol that his ability to think rationally and to conform his behavior to the requirements of the law was lost. The psychotoxic condition in which he found himself was validly describable as an Organic Brain Disorder.

Id. at 3.

Prior to trial, defense counsel submitted an intra-agency request for additional funding to allow Lipman to travel from Illinois to Oklahoma to testify. The request was denied by Robert Ganstine, executive director of the Oklahoma Indigent Defense System (OIDS). During the first stage of trial, defense counsel made the following offer of proof regarding Lipman's testimony if the funding request had been granted:

> At this time, Judge, I want to make an offer of proof as to Dr. Lipman.
> If Dr. Lipman could be here I believe his testimony would be – substantially show that Bryan Toles, based upon his investigation, the – in talking with various witnesses that were with Bryan the night of the incident, his testimony would be substantially that Bryan – that it was his

7

opinion – professional opinion that he was under the influence of alcohol and that he had a BA of I think .53.

I will also state that the reason he is not being called is that the funding for his travel to and from Illinois has been withdrawn by my Executive Director, Robert Ganstine, and that is the reason the witness has not been called.

Tr. at 794. After making the statement, defense counsel rested without presenting any evidence on Toles' behalf.

On direct appeal, Toles asserted that the denial of funding for Lipman's travel and trial testimony violated his Fourteenth Amendment due process rights. The OCCA rejected this argument:

> Illinois pharmacologist, Dr. Jonathan Lipman, was retained by the defense team to investigate and develop the defense of voluntary intoxication. Dr. Lipman interviewed Toles, reviewed his video-taped statements, and reviewed reports prepared by the police and a forensic social worker. The defense filed Dr. Lipman's report with the trial court. Dr. Lipman reported Toles had smoked eight rocks of crack cocaine prior to the murders, and had drunk beer in sufficient quantities to achieve a blood alcohol level of .596. He concluded Toles was "freefalling . . . through a maelstrom of brain chemistry" and was unable to make rational decisions at the time of the killings. In his offer of proof at trial, counsel stated Dr. Lipman would testify to Toles' blood alcohol level of .596.
>
> Dr. Lipman's conclusion that Toles was unable to make rational decisions is controverted sharply by Toles' own statements taken six hours after the murders in which he revealed minute details of the invasion of the Franceschi home. The only details he did not reveal were those indicating his very direct involvement. The next day, after Toles spoke with his mother, Toles again clearly and rationally described the incident in minute detail, including his own thoughts about getting rid of the male witnesses, and his belief "the woman" was "too hysterical to worry about." Two days after the murders Toles stated he had not used any cocaine or "chemical" other than alcohol.
>
> Toles was not denied access to an expert witness in the classic Ake sense. See Ake v. Oklahoma, [470 U.S. 68 (1985)]. Toles obtained an

8

expert who rendered an opinion. While it is true the executive director denied funding to secure the expert's presence at trial, no allegation has been made at trial or on appeal that *but for* inadequate financial resources this witness would have testified at trial.

The executive director of the Oklahoma Indigent Defense System has the statutory duty to guarantee effective representation for the indigent criminal defendant, and to serve in an advisory capacity to attorneys employed by the Oklahoma Indigent Defense System. 22 O.S.1991, § 1355.4(C)(6), (17). By statute the executive director is a member of the defense team, and the Court recognizes the fact that members of a defense team do not always agree on strategy. The executive director has the final say regarding issues which ultimately are decided fiscally, for he has the power to approve or deny requests for the expenditure of funds. See 22 O.S.1991, § 1355.4(F).

The record indicates the executive director's decision not to secure this witness for trial was based on trial strategy. The question therefore becomes one of effective assistance of counsel and is two-fold. Did the executive director deny Toles effective assistance of counsel by deciding Dr. Lipman would not testify at trial, and if so, was trial counsel ineffective for not pressing the issue at trial?

The familiar standard of review for questions of effective assistance of counsel was set forth in Strickland v. Washington, [466 U.S. 668 (1984)]. To carry his burden to prove ineffective assistance, Toles must show the executive director's denial of funds was not reasonable considering all the circumstances, and this error prejudiced his defense. Id. [at 687-88]. Under the Strickland analysis we begin with the strong presumption that the decision not to present this witness was reasonable trial strategy. Id. [at 689]. If we find the executive director's decision was reasonable under the circumstances, our analysis ends there. If we find the decision was not reasonable under the circumstances, we must then determine whether there is a reasonable probability that but for the decision not to present Dr. Lipman, the result of trial would have been different. Id. [at 694].

The contradiction between Dr. Lipman's report of debilitating intoxication and [Toles'] articulate, rational and thorough recounting of the facts in the video-taped interview taken just six hours after the murders, together with the very complete detail he recounted in subsequent interviews, is striking and irreconcilable. Toles' rational behavior was memorialized for the jury to see and hear. Dr. Lipman's report was based, in part, on subsequent interviews with Toles. The conclusions of the report

9

are so thoroughly controverted and discredited by the video-taped interviews, that the jury could not believe both.

It appears the executive director decided the testimony of Dr. Lipman would not be helpful to the defense. This decision is rational and based on the facts and circumstances of this case. The decision not to call Dr. Lipman appears to be sound trial strategy, and the record contains nothing to overcome this presumption. Having found this decision reasonable, we need not analyze the question further.

Toles I, 947 P.2d at 187-88.

The threshold question we must address is what standard of review to apply in deciding Toles' claim. When Toles first raised the denial of funding issue on direct appeal, he requested an evidentiary hearing "to determine the circumstances for the denial of the requested funds." Toles' Direct Appeal Br. at i. Although the OCCA rejected Toles' request for an evidentiary hearing, it nevertheless made a critical, and what now appears to be a clearly erroneous, finding of fact, i.e., that Ganstine denied Toles' funding request for strategic reasons. See 28 U.S.C. § 2254(d)(2). Based upon that finding of fact, the OCCA concluded that Ake was inapplicable, and instead considered whether Ganstine's decision was reasonable under Strickland v. Washington, 466 U.S. 668 (1984). When the Ake issue was reasserted in Toles' application for post-conviction relief with the OCCA, the court held the issue was barred by res judicata.

In light of the evidence submitted by Toles in connection with his application for post-conviction relief, it is clear that Ganstine's decision was not a strategic one. According to the evidence, Ganstine's "role was to decide if the agency [OIDS] had the funds to cover the costs of the tools attorneys needed to do their jobs," and he "was never

10

in a participatory or advisory role." Affidavit of Terri L. Marroquin at ¶ 8 (see Appendix to Toles' Application for Post-Conviction Relief). Thus, Ganstine was "never told the specifics of [a] case or the name of the client" when he was deciding whether to allocate funds. Id. at ¶ 17. Indeed, the record contains an affidavit from Ganstine, submitted in support of Toles' application for post-conviction relief, in which he states that "[i]n denying the request [for funding] in Mr. Toles' case, [he] did not make a strategic decision as a member of Mr. Toles' defense team nor was [his] denial of the request based on any evaluation of the merits of the proposed defense." Affidavit of Robert Ganstine at ¶ 1. Instead, Ganstine indicates, "[i]t was [his] position as administrator to be concerned about the fiscal welfare of the agency and to insure that the attorneys adhered to agency policy." Id. In short, contrary to the findings of the OCCA, the uncontroverted evidence indicates that Ganstine's decision was a purely fiscal one.[2] See 28 U.S.C. § 2254(d)(2), and (e)(1).

Because the OCCA's misperception of Ganstine's role led it not to address the merits of Toles' Ake claim, we proceed to do so, applying a de novo standard of review. See Gonzales v. McKune, 247 F.3d 1066, 1072 (10th Cir. 2001) ("If a state court did not

---

[2] There is some evidence in the record on appeal that Dr. Lipman had been involved in an earlier criminal case arising in Oklahoma County. According to Dr. Lipman, there was a dispute in that case concerning who would pay his fees, i.e., either the Oklahoma County Public Defender's Office or the OIDS. Dr. Lipman suggests this earlier dispute may have had some impact on Ganstine's decision not to approve funding for Lipman to travel to Oklahoma to testify in Toles' case.

hear the petitioner's claims on the merits, . . . we review the district court's legal conclusions de novo.").  In doing so, we note, as did the OCCA and the district court below, that Toles "was not denied access to an expert witness in the classic <u>Ake</u> sense." <u>Toles I</u>, 947 P.2d at 187.  Indeed, we remain uncertain whether the <u>Ake</u> framework applies to circumstances such as those here, where funding decisions impacting a capital defendant are made not by the trial court but by the head of a state-funded indigent defense system.  However, because we conclude there is no merit to Toles' claim, we assume, without deciding, that <u>Ake</u> applies in these circumstances.

In <u>Ake</u>, the Supreme Court noted that "when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense."  470 U.S. at 76.  Without going so far as holding "that a State must purchase for the indigent defendant all the assistance that his wealthier counterpart might buy," the Court explained that indigent defendants must have "access to the raw materials integral to the building of an effective defense." <u>Id.</u> at 77.  Applying these principles to the facts before it, the Court held that when an indigent defendant demonstrates that sanity at the time of the offense will be a significant factor at trial, the defendant must be provided access to a "competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." <u>Id.</u> at 83.

The question here is whether, under the particular circumstances of the case,

12

Lipman's testimony could legitimately be characterized as "integral to the building of an effective defense," i.e., one of the "basic tools of an adequate defense." Id. at 77. Under Tenth Circuit precedent, three factors are generally considered in deciding this question: (1) the effect on Toles' private interest in the accuracy of the trial if the requested service is not provided; (2) the burden on the government's interest if the service is provided; and (3) the probable value of the additional service and the risk of error in the proceedings if such assistance is not offered. Rojem v. Gibson, 245 F.3d 1130, 1139 (10th Cir. 2001). Because the first two factors are typically satisfied in favor of an indigent capital defendant, the third factor is the "critical" one in deciding "whether a particular expert is a required 'basic tool' of an adequate defense." Johnson v. Gibson, 169 F.3d 1239, 1246-47 (10th Cir. 1999).

Toles goes to great lengths to outline why Lipman's testimony was critical to his voluntary intoxication defense. In particular, Toles contends that "only Dr. Lipman could have provided the expert testimony needed to describe the physiological and psychological effects of the combination of alcohol and drugs, and lay witnesses certainly could neither conduct neuropsychological or neuropharmacological tests nor present the results of such tests to the jury." Toles' Opening Br. at 37. Toles further contends that the risk of error in the trial proceedings without Lipman's testimony was substantial because he was essentially deprived of "any meaningful first stage defense" to the state's assertion that he acted with malice aforethought in killing the two victims. Id. at 41.

13

We assume, without deciding, that Toles can establish that Lipman's testimony was one of the "basic tools of an adequate defense" and that the denial of funding for Lipman's trial testimony therefore resulted in a violation of his due process rights. The question then becomes whether the error was harmless. The denial of expert assistance in violation of Ake is trial error subject to harmless error analysis under the standard set forth in Kotteakos v. United States, 328 U.S. 750, 776 (1946) (asking whether the error "had substantial and injurious effect or influence in determining the jury's verdict").[3] See Brewer v. Reynolds, 51 F.3d 1519, 1529 (10th Cir. 1995). Under this standard, we can grant relief only if we believe the error substantially influenced the jury's decision, or if we are in grave doubt as to the harmlessness of the error. See O'Neal v. McAninch, 513 U.S. 432, 436 (1995).

In deciding the harmless error question, we turn first to Oklahoma law on the defense of voluntary intoxication. Under Oklahoma law, "voluntary intoxication has long been recognized as a defense to the crime of First Degree Malice Murder." Taylor v. State, 998 P.2d 1225, 1230 (Okla. Crim. App. 2000). "If voluntary intoxication is to be relied upon as an affirmative defense, the defendant must introduce sufficient evidence to raise a reasonable doubt as to his ability to form the requisite criminal intent." Id. More

---

[3] Although Toles suggests the denial of funding resulted in structural error, he is clearly mistaken. In Brewer v. Reynolds, we held "that 'a right to which a defendant is not entitled absent some threshold showing [cannot] fairly be defined as basic to the structure of a constitutional trial.'" 51 F.3d 1519, 1529 (10th Cir. 1995) (quoting Starr v. Lockhart, 23 F.3d 1280, 1291 (8th Cir. 1994)).

14

specifically, "[a] defense of voluntary intoxication requires that a defendant, first, be intoxicated and, second, be so utterly intoxicated, that his mental powers are overcome, rendering it impossible for a defendant to form the specific criminal intent or special mental element of the crime." Jackson v. State, 964 P.2d 875, 892 (Okla. Crim. App. 1998). Notably, the OCCA has held that a defendant's "detailed account of the circumstances surrounding [a] murder defeats [a] claim to a voluntary intoxication defense." Bland v. State, 4 P.3d 702, 718 (Okla. Crim. App. 2000); Taylor, 998 P.2d at 1230 (same); Turrentine v. State, 965 P.2d 955, 969 (Okla. Crim. App. 1998) (same).

Reviewing the record in light of these principles, it is clear that the first-stage evidence fell far short of meeting the required standards for establishing a voluntary intoxication defense. Toles gave four videotaped statements to the police, all of which were introduced by the prosecution during the first stage of trial. In the first statement, given approximately seventeen hours after the murders, Toles admitted participating in the burglary of the Franceschi home, but maintained that Young was responsible for shooting the two victims. In the second statement, given a day later, Toles acknowledged that he had lied during the first interview about the extent of his participation. Further, Toles admitted he was responsible for the murders and outlined in detail what transpired during the invasion of the Franceschi home. In the third statement, given the same day as the second statement, Toles again admitted to shooting the two victims and described the crime in detail, including the events preceding the decision to burglarize the Franceschi

15

home, how the Franceschi home was selected, what type of gun was utilized during the crime, what actions he, his co-conspirators and the victims took after the home was invaded,[4] and his reasons for shooting the two victims.[5] In the fourth statement, taken two days after the murders, Toles was asked the following questions and gave the following responses:

> Detective:    Okay. Also, I need to ask you about your physical condition that night. Had you been drinking?
> Toles:    Yes, I had.
> Detective:    But when you did this did you know what you were doing in your state of mind?
> Toles:    I was aware of everything that was happening.
> Detective:    Were you on any type of drug?
> Toles:    Not chemical drugs, no. Alcohol.
> Detective:    Just alcohol. I'm talking about like cocaine or something.
> Toles:    No.
> Detective:    You were completely aware of what was going on, is that right?
> Toles:    Yes, sir.

Tr. of Interview #4, at 2.

---

[4] For example, Toles testified that Juan Franceschi was "still fighting" and "coming towards" Toles when Toles shot him "in this side of his chest . . . [o]ver by the heart." Tr. of Interview #3 at 7. Toles continued: "And then [Juan Franceschi] staggered back almost into the hallway and I followed him back there and I shot him once again." Id.

[5] Toles was asked what "was going through [his] mind when [he] shot [Juan] the second time." Tr. of Interview #3 at 8. Toles responded: "After I shot him the first time, to tell you the truth, I was thinking, I said, hell, I shot him so I might as well just go ahead and kill him then." Id. Likewise, Toles was asked why he shot Lonnie Franceschi in the head at close range as he was leaving the Franceschi home. Toles responded: "[H]e was raising up and he just had some shorts on. I didn't know if he had a weapon or not or anything and as I was running out of the house I said, damn, there's still him left was going through my mind. Since I shot the other one so I just shot at him." Id. at 12.

16

Toles' videotaped statements were bolstered by testimony from two of the state's other first-stage witnesses. Co-conspirator Casey Young testified that Toles had been drinking alcohol on the evening of the murders, but he expressly denied that Toles ingested cocaine or other illicit drugs prior to the murders. Tr. at 571 ("No drugs besides alcohol."). Young further testified that, based upon what he observed from Toles' behavior, it appeared that Toles understood what he was doing. Another witness, Joseph Vicks, testified that he spoke with Toles immediately following the murders and spent the next four hours with Toles, during which time Toles talked at length about the crime. According to Vicks, Toles was not slurring his words or stuttering and did not otherwise appear to be drunk. None of the witnesses at trial (either first-stage or second-stage) testified about Toles ingesting crack cocaine or any other illicit drugs prior to the murders.

In sum, none of the first-stage evidence substantiated Toles' voluntary intoxication theory. Although the evidence indicated that Toles had consumed alcohol prior to the murders,[6] there was no evidence indicating that Toles consumed any illicit drugs. Further, the evidence indicated that Toles was able to provide acquaintances and police with repeated, detailed accounts of the crime. Thus, although Toles may have been able

---

[6] During the second and third statements, Toles indicated to the police that he was "drunk" or "intoxicated" at the time of the crimes. Tr. of Interview #2 at 8 ("I was intoxicated at the time and, as far as I told the detective yesterday at first, I mean, I didn't have no remorse say about it at first none at all."); Tr. of Interview #3 at 8 ("I didn't . . . you know, I mean, I was drunk, I wasn't thinking all that clear.").

17

to establish that he was under the influence of alcohol at the time of the murders, we are convinced he could not have demonstrated, as required by Oklahoma law, that his mental powers were overcome by the effects of alcohol, rendering it impossible for him to form malice aforethought.

For these reasons, we are firmly convinced that the denial of funding for Lipman's trial testimony did not have a substantial injurious impact on the jury's first-stage verdicts. Had Lipman appeared at trial, he would have testified, in part, that Toles reported smoking eight rocks of crack cocaine in the four hours preceding the murders. Obviously, this testimony would have been directly contradictory to all of the other first stage evidence, including Toles' videotaped, post-arrest statements to the police. Given the great weight of the evidence indicating that Toles did not ingest any illicit drugs prior to the murders, we conclude the jury would have rejected this portion of Lipman's testimony. In turn, it seems certain the jury would have given little, if any, weight to Lipman's related conclusion that Toles "was so massively intoxicated under the combined influence of cocaine and alcohol that his ability to think rationally and to conform his behavior to the requirements of the law was lost."[7] Thus, any constitutional error arising

---

[7] Lipman's conclusions regarding Toles' blood alcohol level at the time of the murders also seem highly questionable. Although some of the witnesses presented by the defense during the second-stage proceedings testified that Toles consumed a large amount of alcohol in the hours preceding the crimes, that evidence was controverted by the prosecution's evidence which, as previously indicated, suggested that Toles was not so intoxicated that he was unable to form the necessary criminal intent.

18

out of the denial of funding for Lipman's trial testimony was harmless.

Finally, we note that Toles' appellate brief contains passing references to the effect Lipman's testimony may have had on the outcome of the second-stage proceedings. See Toles' Br. at 26 ("Absent the expert testimony of Dr. Lipman, Toles . . . was denied powerful mitigation evidence."), at 45 (noting that the affidavit of one of the jurors indicated "Lipman's testimony would have affected his decision to impose the death penalty"). If Toles is asserting an Ake claim regarding the effect of Lipman's testimony on the second-stage proceedings, we will not address it because it was not adequately presented to the district court,[8] and has not been presented to and decided by the OCCA. Indeed, because the OCCA would now conclude the claim is procedurally barred, see McCracken v. State, 946 P.2d 672, 674 (Okla. Crim. App. 1997) (noting the OCCA will not consider an issue which could have been raised on direct appeal), it is considered "procedurally defaulted for purposes of federal habeas relief," Thomas v. Gibson, 218 F.3d 1213, 1221 (10th Cir. 2000), and Toles does not assert that the procedural default is overcome by cause and prejudice or that application of the procedural bar will result in a fundamental miscarriage of justice.

---

[8] The only arguable reference to the claim in Toles' federal habeas petition is found on page 42 where Toles refers to the post-trial statements of one of the jurors indicating "that Dr. Lipman's testimony would have affected his decision to impose the death penalty." In our view, this single sentence was insufficient to give the district court adequate notice of the claim.

*Admission of Toles' videotaped statements to police*

Toles contends that the four videotaped statements he gave to police following his arrest, all of which contained inculpatory statements, were improperly admitted at trial. According to Toles, the statements were obtained in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments because he did not knowingly and intelligently waive his constitutional rights as required by Miranda v. Arizona, 384 U.S. 436 (1966).

Toles first raised this issue at trial. The trial court conducted a hearing pursuant to Jackson v. Denno, 378 U.S. 368, 376-77 (1964), during which Toles and Larry Mahamed, the lead detective on the case, testified. According to Toles, he was arrested by an Officer Puccino on July 16, 1993. At the time of his arrest, Toles testified, he asked Puccino if he could speak to an attorney. Puccino allegedly did not respond to Toles' request, and instead placed him in a patrol car, transported him to the city jail, and placed him in a conference room. Toles and Mahamed both testified that Mahamed escorted Toles from the conference room to Mahamed's office, where Mahamed advised Toles of his rights and advised Toles of why he was under arrest. According to Mahamed, he never saw Officer Puccino and was unaware that Toles had asked to speak to an attorney. Mahamed testified that Toles stated, after being advised of his rights, that he had an Oklahoma City attorney he wanted to call. Mahamed allegedly said "Fine," and began escorting Toles to the county jail. Tr. at 675. Mahamed testified that as he was taking Toles to the jail, Toles said "Stop. Just a minute. I'll talk." Id. at 676. Mahamed then

20

escorted Toles to an interview room where he again advised Toles of his <u>Miranda</u> rights, Toles agreed to waive his rights, and Toles proceeded to give the first of his four videotaped statements. Mahamed testified that at no time during that interview or any of the subsequent interviews did Toles indicate he wanted to speak to an attorney. Toles testified that after the first interview Mahamed told him that if he did not cooperate he would more than likely receive a death sentence. Toles further testified that Mahamed told him that if he cooperated fully Mahamed would talk to the district attorney about getting Toles a life sentence. According to Toles, Mahamed's offer to speak to the district attorney is what prompted him to contact detectives and give his second and third videotaped statements the following day. Mahamed admitted that he told Toles he could possibly receive a death sentence, but he testified he did so after Toles' third videotaped statement, and in response to questions posed by Toles. Mahamed denied ever offering to speak to the district attorney. At the conclusion of the hearing, the trial court found that Toles' statements were freely and voluntarily given after a knowing and intelligent waiver of his <u>Miranda</u> rights and allowed all of the videotaped statements to be admitted at trial.

Toles challenged the admissibility of the statements on direct appeal. The OCCA rejected Toles' arguments and concluded the videotaped statements were properly admitted:

> Toles asserts . . . that suppression of his custodial statements was improperly denied by the trial court. In response to the motion to suppress, the trial court properly held a <u>Jackson v. Denno</u> hearing to determine whether Toles' custodial statements were voluntary. In that hearing

21

uncontroverted evidence established the following sequence of events: 1) Toles asked for an attorney when he was arrested and placed in a squad car; 2) he received the Miranda warnings and again asked for his attorney when he arrived at the police station; 3) questioning was not begun, and he was told he would still have to be booked; 4) he stated he had changed his mind and he would talk to the police without counsel present; and 5) questioning was begun after this affirmative waiver.

Toles argues his waiver was not valid, for all police contact should have stopped when he asked for an attorney upon his initial contact with the police. He claims the subsequent Miranda warning violated his Fifth and Sixth Amendment right to counsel.

Under some circumstances the differences between the Fifth and Sixth Amendment right to counsel are of critical importance to a case. The Fifth Amendment right to counsel must be asserted by the accused and it covers interrogation concerning any offense, past or present, charged or uncharged. The Sixth Amendment right is offense-specific and attaches at the time judicial proceedings have been initiated against the accused. These distinctions are not dispositive in the case before us, for the focus of our inquiry is on waiver.

Once the right to counsel has been asserted under the Fifth Amendment, or has attached under the Sixth Amendment, a valid waiver of that right cannot be established by showing only that the accused responded to further police-initiated custodial interrogation even if the accused has been advised of his rights. An accused may change his mind, however, and affirmatively waive the right to counsel secured by either Amendment. Police interrogation following an affirmative waiver does not run afoul of the constitution.

Toles asserted his right to counsel twice--first as he got into the squad car when he was arrested, and again following the administration of the Miranda warnings at the police station. The record is clear that as soon as Toles asserted the right to counsel at the station, the police communication turned immediately to administrative matters and Toles was advised he would have to be booked into jail. It was not until Toles told the police he would talk to them without counsel that police questioning began. Toles waived his right to counsel with this affirmative statement.

Toles also argues the police coerced his confession with offers of leniency. At the Jackson v. Denno hearing the interrogating officers expressly denied making any offers to Toles. Relevant evidence on this question introduced at the hearing included three video-taped statements by Toles. One statement was taped the day of the murder; two statements were

22

taped the day after the murder.

In the first statement Toles admitted being present during the murders but denied shooting anyone. In the second statement he admitted he shot the victims. In the third he more fully explained his motives and the details of the crime. The interrogator asked Toles during the second taped interview why he admitted the shootings he had earlier denied. Toles replied he had talked with his mother who asked him how he would feel if his father and brother had been murdered.

To defeat a motion to suppress, the State bears the burden to prove by a preponderance of the evidence the accused's statements were voluntary. The video-taped statement in which Toles explains the reason for his change of heart carries the State's burden. The trial court properly denied Toles' motion to suppress.

Toles I, 947 P.2d at 186-87 (internal citations and footnotes omitted).

Much as he did in state court, Toles asserts two general arguments in this federal habeas proceeding. First, he asserts that his "initial statement should have been suppressed because it was taken in violation of [his] Fifth and Sixth Amendment rights to counsel." Toles' Opening Br. at 68. "The remaining three statements," he argues, "are also suppressible because they were obtained as a direct result of the violation of the right to counsel which occurred prior to the first interview." Id. Second, Toles asserts that his "second and subsequent statements were suppressible because they were induced by promises of lenience." Id.

In Edwards v. Arizona, 451 U.S. 477, 484-85 (1981), the Supreme Court held that "an accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges,

or conversations with the police." The Edwards rule is violated "[i]f police initiate subsequent contact without the presence of counsel," and any statements made by the accused in that situation "will be presumed involuntary, even where his statements would otherwise be deemed voluntary under traditional standards." Pickens v. Gibson, 206 F.3d 988, 994 (10th Cir. 2000). If, however, the accused initiates further communication with the police, the Edwards rule is not violated, and the question then becomes simply whether the accused knowingly and intelligently waived his rights to counsel and to silence. Oregon v. Bradshaw, 462 U.S. 1039, 1045-46 (1983).

Here, the OCCA reasonably concluded that Detective Mahamed did not violate Toles' constitutional rights in obtaining the initial videotaped statement. It was uncontroverted that Toles invoked his right to counsel immediately following his arrest by Officer Puccino. Thus, it is clear that Toles was thereafter protected by the Edwards rule. Whether Mahamed violated the Edwards rule by escorting Toles from a conference room to his office and then advising Toles of his Miranda rights is irrelevant because the Oklahoma courts found, as a matter of historical fact, that Toles responded to Mahamed's actions by again invoking his right to counsel. The Oklahoma courts further found that Mahamed complied with Toles' request and began escorting him to the jail for booking. Finally, and most importantly, the Oklahoma courts found that it was Toles who ultimately initiated the critical communications with Mahamed by saying: "Stop. Just a minute. I'll talk." Tr. at 676. Because these factual findings by the Oklahoma courts are

24

presumed to be correct under 28 U.S.C. § 2254(e)(1), and Toles has failed to come forward with evidence sufficient to overcome that presumption, it is clear that the first videotaped statement was not obtained in violation of the Edwards rule. Thus, the only remaining question is whether Toles knowingly and intelligently waived his rights by agreeing to provide Mahamed with the initial videotaped statement. See Bradshaw, 462 U.S. at 1046. On this point, the evidence was uncontroverted. Toles conceded at the Jackson v. Denno hearing that Mahamed advised him of his rights and that he agreed to waive them prior to responding to further questioning from Mahamed. The first videotaped statement confirms this because it begins with Mahamed advising Toles of his rights and Toles agreeing to waive those rights. Thus, Toles knowingly and intelligently waived his rights prior to providing Mahamed with the first statement.

The OCCA also reasonably concluded that Toles' final three videotaped statements were voluntarily given. Although Toles asserted the three statements were coerced by offers of leniency from Mahamed, the OCCA found otherwise. More specifically, the OCCA found, after reviewing the final three videotaped statements, that Toles decided to contact Mahamed and confess to the crimes after speaking with his mother, "who asked him how he would feel if his father and brother had been murdered." Toles I, 947 P.2d at 187. This finding of historical fact is entitled to a presumption of correctness, and Toles is unable to overcome the presumption with clear and convincing

25

evidence.[9]  28 U.S.C. § 2254(e)(1).  In turn, Toles is unable to establish that the OCCA

erred in concluding that the final three videotaped statements were the product of his free

and deliberate choice.


*Sufficiency of evidence to support HAC aggravator*

Toles contends his death sentences are unconstitutional because the evidence

presented at trial was insufficient to establish the existence of the "heinous, atrocious or

cruel" (HAC) aggravator.  According to Toles, "the facts indicate the shootings of both

Juan and Lonnie Franceschi occurred quickly and were not designed to cause great

suffering."  Toles' Opening Br. at 86.  "As a result," Toles contends, "the record can not

be read rationally to support [the HAC] aggravator beyond a reasonable doubt."  Id.

Toles first raised this issue on direct appeal.  The OCCA rejected Toles'

arguments, concluding the evidence was sufficient to support the HAC aggravator:

> In order to prove the "heinous, atrocious or cruel" aggravator, the
> State had to prove beyond a reasonable doubt the death of the victim was
> preceded by torture or serious physical abuse.  A slow, painful death
> satisfies this condition precedent.
> When Toles shot Juan Franceschi in the chest, the .22 caliber bullet
> pierced his lung and lodged in his back.  Franceschi died as a result of two
> pints of blood leaking into his chest cavity and suffocating him.  The
> medical examiner testified the wound did not cause immediate loss of

---

[9]  The OCCA's finding on this point is supported not only by the videotaped
statements, but also by Detective Mahamed's testimony at the Jackson v. Denno hearing,
during which he denied making any offers of leniency to Toles after the first videotaped
statement.

consciousness, and the record shows Franceschi did not die until the paramedics arrived. This slow, lingering death is sufficient to prove serious physical abuse.

Toles shot Lonnie Franceschi in the back of the head. After Toles ran out of the house, Lonnie managed to get to his room where his mother heard him crying and gasping for air. The medical examiner testified this injury would have been extremely painful. We do not know exactly when Lonnie lost consciousness, but we know he did not lose consciousness immediately. Again, the slow, painful sinking into unconsciousness is sufficient to prove serious physical abuse.

Toles I, 947 P.2d at 190 (internal citations omitted).

Because Toles' challenge to the HAC aggravator is an evidentiary one, the "rational factfinder" standard announced in Jackson v. Virginia, 443 U.S. 307 (1979), governs our review. See Romano v. Gibson, 239 F.3d 1156, 1176 (10th Cir. 2001). The issue thus presented is whether there was sufficient evidence to satisfy Oklahoma's constitutionally narrowed standards for establishing the HAC aggravator. Id. "A murder is especially heinous, atrocious or cruel under Oklahoma law if it is preceded by torture or serious physical abuse. Torture includes the infliction of either great physical anguish or extreme mental cruelty, while physical abuse requires evidence of conscious physical suffering." Id. (internal quotations omitted).

A careful review of the trial transcript indicates that the evidence was more than sufficient to establish that both victims endured conscious physical suffering prior to their deaths. The forensic pathologist who performed autopsies on the victims testified that the chest wound incurred by Juan Franceschi could have been extremely painful (it caused bleeding into the chest cavity, which in turn compressed Juan's lung), but would not have

27

caused Juan to lose consciousness immediately. The pathologist's testimony on this point was supported by the testimony of other witnesses who testified that Juan remained conscious after being shot by Toles in the arm and the chest, and indeed continued to physically struggle with Toles after the wounds were inflicted. As for Lonnie Franceschi, the pathologist testified that the gunshot wound to his head, though likely painful and ultimately fatal, would not necessarily have caused Lonnie to lose consciousness immediately. The pathologist's testimony regarding Lonnie was again bolstered by testimony from other witnesses. It was uncontroverted that Toles shot Lonnie in the living room of the Franceschi home, yet Lonnie was found by paramedics in his bedroom. Further, Norma Franceschi, the only surviving victim of the crimes, testified that as she lay hiding under her daughter's bed, she heard a final gunshot, followed by the sounds of Lonnie crying and gasping for air. In sum, it is clear that a rational factfinder, viewing the evidence in the light most favorable to the prosecution, could have found that both victims endured conscious physical suffering prior to their deaths, and in turn would have found the existence of the HAC aggravator.

Accordingly, we conclude the OCCA's decision is neither contrary to nor an unreasonable application of clearly established federal law, and Toles is not entitled to federal habeas relief on this issue.

The judgment of the district court is AFFIRMED.

28

00-6337, <u>Toles v. Gibson</u>

**EBEL, Circuit Judge, Concurring**:

I join the majority's opinion in its entirety, with the following qualification. In my view, de novo review of the petitioner's <u>Ake</u> claim is appropriate because the Oklahoma Court of Criminal Appeals unreasonably applied <u>Ake</u>, rather than because that court did not reach the merits of the <u>Ake</u> claim.

00-6337, Toles v. Gibson

**HENRY, Circuit Judge, Concurring:**

I, like Judge Ebel, join Judge Briscoe's opinion in its entirety, with the following qualification. In light of Aycox v. Lytle, 196 F.3d 1174, 1177-78 (10th Cir. 1999) ("We conclude. . . that we owe deference to the state court's *result*, even if its reasoning is not expressly stated."), I think we must conclude that the OCCA did adjudicate the Ake issue, despite the short shrift given to that issue. Nevertheless, I agree with both Judges Briscoe and Ebel that pre-AEDPA standards of review apply. Pre-AEDPA standards of review (and thus *de novo* review of Mr. Toles' claim under Ake) apply because either: 1) the OCCA unreasonably applied Ake, as argued by Judge Ebel; or 2) the OCCA's determination that Mr. Ganstine's refusal to fund Dr. Lipman's travel amounted to "trial strategy" itself amounted to an "unreasonable determination of the facts" under 28 U.S.C. § 2254(d)(2), cf. Slip. Op. at 10-11 (essentially reaching the same conclusion: "[The OCCA] made a critical, and what now appears to be a clearly erroneous, finding of fact, i.e. that [Mr.] Ganstine denied [Mr.] Toles' funding request for strategic reasons. . . . In short, contrary to the findings of the OCCA, the uncontroverted evidence indicates that [Mr.] Ganstine's decision was a purely fiscal one."). It was this unreasonable determination that led the OCCA to conclude that, because Mr. Toles, through his 'counsel' Mr. Ganstine, had himself chosen to forego Dr. Lipman's testimony, the balance of the analysis

should proceed under <u>Strickland</u> rather than <u>Ake</u>.  <u>See</u> <u>Toles v. State</u>, 947 P.2d

180, 187 (Okla. Crim. App. 1997) (effectively concluding its '<u>Ake</u> analysis' by

reasoning: "The record indicates [Mr. Ganstine's] decision not to secure [Dr.

Lipman] for trial was based on trial strategy.  The question therefore becomes one

of effective assistance of counsel. . .").